UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

TYRALYNN HARRIS, ET AL.                    CIVIL ACTION

VERSUS                                     NO: 11-752

NEW ORLEANS POLICE DEPARTMENT, ET AL.      SECTION: R(4)

## ORDER AND REASONS

Before the Court is a motion for summary judgment filed by
defendants the City of New Orleans, Superintendent Ronal Serpas,
Officers Eric Geisler, James Kish, Stephen McGee, Jonathan
Parker, and Stuart Smith (the Officers).[1] Having reviewed the
motion, briefs, evidence and applicable law, the Court finds that
summary judgment in favor of the defendants is proper and GRANTS
the motion for summary judgment on the grounds that defendant
officers are entitled to qualified immunity.


**I. Background**

In April 2010, Plaintiff Tyralyn Harris lived with her
former husband Brian Harris, along with their two children,
plaintiffs Jalen Aubert and Jai Harris, at 7731 Allison Road in
New Orleans, Louisiana.[2] On April 9, 2010, Tyralyn Harris had
become concerned about the well being of Brian Harris. She called

---

[1] R. Doc. 49.

[2] R. Doc. 1 at 1, 13.

911 to ask for assistance after she observed Mr. Harris lock himself in their bedroom.[3] The following is a transcript of the pertinent parts of Tyralyn Harris's 911 call:

Complaint Operator: Police operator 104

Tyralyn Harris:     Hi. I um, need some, uh, some, uh, my, um husband barricaded himself in a room, and I don't think he want to live no more. I need somebody to come help him.

CO:     Okay, does your husband have mental problems?

TH:     He have...Yeah, he do. He have drug...He trying to not use drugs and I just think he messed up. I don't know what else to do...

CO:     Okay, but other than that, he hasn't been diagnosed, like schizophrenic or bipolar or anything like that, huh?

TH:     No. No ma'am.

...

CO:     Are there any weapons inside of the house? Like do he have any kind of guns or anything?

TH:     No guns, but I think he got a, a probably a knife or something in there like you know, from the kitchen, I don't know what he got.

CO:     And he's inside your bedroom?

TH:     Yeah. We outside. I think he took some pills or something. He told me take the children away from here.

---

[3] R. Doc. 1 at 13.

2

```
...

CO:                  Okay. We're going to send the
                     police over there, okay?

TH:                  They need to send an ambulance,
                     too, or somebody. They need to
                     bring him to the hospital because
                     something's wrong with him.

CO:                  Okay. Alright.[4]
```

The 911 dispatcher relayed the call to the New Orleans
Police Department (NOPD) and several units responded, including
Sergeants Stuart Smith and Eric Geisler, and NOPD officers
Stephen McGee, Jonathon Parker, James Kish, and Patrick Hartman.[5]
When the officers arrived at about 10:22 p.m., Tyralyn Harris was
standing with her and Mr. Harris's two children near her Ford F-
150 truck parked directly in front of her residence.[6] Before the
officers entered the home, Tyralyn Harris told them that Mr.
Harris was depressed after recently losing his job, that he had
locked himself inside their bedroom, that she believed he may
have taken an overdose of sleeping pills, the quantity and type
of which were unknown, and that he was most likely armed with a
knife that he always carried because of his former employment as

_____

[4] R. Doc. 49-3 at 44-45.

[5] *Id.* at 24-25.

[6] *Id.* at 3.

3

a welder.[7] She expressed concern for the well-being of her former husband but did not express fear for her own, or the children's health or safety. The officers obtained keys to the bedroom from Tyralyn Harris and the officers attempted to gain access to the room.

Defendants have submitted videos captured by the tasers used by officers Kish and Parker at the scene in support of their motion for summary judgement.[8] The tasers are designed to automatically record audio and video by way of a small camera mounted on the front of the device when the safety on the device is disengaged.[9] The taser video captured by Officer Kish's device began when the officers were outside of the bedroom door. The video begins aimed at the floor. The legs of some of the officers are visible. Then an officer called out the name "Brian," to no response. One of the officers, presumably Sergeant Smith, said, "Come here, I want one gun and one taser right here, alright." Sergeant Smith made several unsuccessful attempts to unlock the door.[10] The officers then unlocked the door and found it barricaded. Two large dressers had been moved into the path of

---

[7] *Id.* at 3-4, 47.

[8] Defendant's exhibits 11, 12.

[9] R. Doc. 49-3 at 39.

[10] R. Doc. 49-3 at 4.

4

the doorway.[11] The video shows the officers forcing the door open, calling out "Brian" and then entering the room. Officers McGee, Kish, and Parker entered the bedroom and Sergeant Smith, Sergeant Geisler, and Officer Hartman observed the incident from the hallway.[12] The bedroom was a square, approximately twelve feet by twelve feet, with two large dressers and a queen-sized bed.[13] The bed was centrally positioned against the wall opposite the door. Once they entered the room, the officers began yelling "let me see your hands." The officers did not verbally identify themselves as police to Mr. Harris, but they were wearing police uniforms.[14] Mr. Harris was lying in the bed under a blanket, not moving. The officers repeatedly demanded to see his hands. When Mr. Harris did not respond, Officer McGee removed the blanket revealing Mr. Harris, dressed in boxer shorts and a tank top, lying on his bed. Mr. Harris was holding a folding knife in his right hand. The officers repeatedly yelled at him to "put it down, put it down! Put down the knife!" Mr. Harris responded, "It's not coming down." Mr. Harris waived and crossed his arms. The video shows that at that point in time, Mr. Harris was lying on his back in bed with the knife in his right hand waiving his

---

[11] *Id.* at 4.

[12] *Id.* at 4.

[13] R. Doc. 55 at 5.

[14] R. Doc. 49-3 at 24-27.

hands back and forth above his chest. His head was raised slightly off of his pillow, and he did not otherwise move. Mr. Harris continued to not comply with the officers' repeated commands to put the knife down. Sergeant Smith then ordered Officer Kish to "tase him." Officer Kish deployed his taser, about 26 seconds after the officers first entered the bedroom. One of the two steel darts that Officer Kish shot at Mr. Harris did not hit him, and it appears that no shock was administered. Mr. Harris sat up and made a swinging motion with the knife as the first video, from Officer Kish's taser, cut out.

After Officer Kish deployed his taser, Mr. Harris got out of bed and stood up.[15] The next taser video lasts only six seconds.[16] As it begins, Mr. Harris is standing up and Officer Parker is using his taser on him. Mr. Harris appeared agitated and defiant. Officer Parker's taser attempt apparently failed to work because Mr. Harris did not become incapacitated. Mr. Harris lifted his right hand, holding the knife above his right shoulder in a stabbing position. An officer yelled "Drop the knife!" Mr. Harris responded, "I'm not dropping nothing." Mr. Harris was then told again to drop the knife. During this exchange, Mr. Harris was waiving his arms at the taser wires and moving forward toward the officers. An instant later, gun shots rang out. Officer McGee had

---

[15] R. Doc. 106 at 8 n. 14.

[16] Defendant's exhibit 12.

6

fired three shots at Harris, two of which hit his torso, and one his thigh.[17] McGee used a departmentally-issued Glock model 22 semi-automatic handgun.[18] After the gun shots, an officer yelled "Get back! Get back! Get back!" The second video ended at that point.

After being shot, Mr. Harris slumped to the floor. Officer Parker attempted to provide medical care to Harris until the EMT unit arrived. According to the EMT, Mr. Harris repeated "I'm going to die, I'm going to die."[19] She specifically denied that Harris said, "I want to die," as was Sergeant Smith's recollection.[20] Mr. Harris was transported to University Hospital where he died from the gun shot wounds.

Plaintiffs are Tyralyn Harris, on behalf of herself and her two minor children with Brian Harris, Jai Harris and Jalen Aubert; Shannon Grace, on behalf of herself and her minor child with Brian Harris, Branin Harris; and Brian Jourdan and Briankika Jourdan, grown children of Brian Harris. Plaintiffs bring suit under 42 U.S.C. § 1983, alleging that defendants violated Brian Harris's constitutional rights. Specifically, plaintiffs allege that the officers involved in the incident used excessive force

---

[17] R. Doc. 55 at 6.

[18] R. Doc. 49-3 at 29.

[19] R. Doc. 55 at 6.

[20] R. Doc. 49-3 at 57.

against Brian Harris in violation of the Fourth Amendment and
that the officers are not entitled to qualified immunity.
Plaintiffs further allege that the City of New Orleans is liable
under *Monell* for the inadequate policies and procedures which
allegedly led to Brian Harris's death. Plaintiffs also seek
relief under Louisiana's wrongful death and survival statutes,
Louisiana Civil Code article 2315.


## II. Legal Standard

Summary judgment is appropriate when "the movant shows that
there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law." Fed. R. Civ.
P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23
(1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.
1994). When assessing whether a dispute as to any material fact
exists, the Court considers "all of the evidence in the record
but refrains from making credibility determinations or weighing
the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness
Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008). All reasonable
inferences are drawn in favor of the nonmoving party, but
"unsupported allegations or affidavits setting forth 'ultimate or
conclusory facts and conclusions of law' are insufficient to
either support or defeat a motion for summary judgment." *Galindo
v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985);

8

*Little*, 37 F.3d at 1075.

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263-64 (5th Cir. 1991). The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial. *See, e.g., id.* at 325; *Little*, 37 F.3d at 1075; *Isquith ex rel. Isquith v. Middle South Utils., Inc.*, 847 F.2d 186, 198 (5th Cir. 1988), *cert. denied*, 488 U.S. 926 (1988). Although a nonmovant's

9

failure to respond to a motion for summary judgment does not permit the entry of a "default" summary judgment, the court may accept the movant's evidence as undisputed. *Eversley v. Mbank Dallas*, 843 F.2d 172, 174 (5th Cir. 1988).

## III. Discussion

### A. *Standing*

Plaintiffs filed suit alleging violations of 42 U.S.C. § 1983 and Louisiana's wrongful death and survival statutes, La. C.C. art. 2315.1; art. 2351.2. Defendants contend that each of the plaintiffs lacks standing to bring these claims in this court because they have not established that they are Mr. Harris's child or spouse. Plaintiffs argue that defendants have waived their standing defense by failing to raise the issue until their motion for summary judgment and that plaintiffs have nevertheless established standing.

Defendants have not waived their standing defense. Rule 9 of the Federal Rules of Civil Procedure states that a party seeking to challenge capacity "must do so by a specific denial, which must state any supporting facts that are peculiarly within the party's knowledge." Fed.R.Civ.P. 9(a)(2). If the defendant fails to plead that the plaintiff lacks capacity in a timely manner, the objection is waived and the defense is lost. *Lang v. Tex. & Pac. R.R. Co.*, 624 F.2d 1275, 1277 (5th Cir.1980). However, a

challenge to capacity is untimely only when raised on the eve of, during, or after trial. *See, e.g., Henderson v. Turner*, CIV.A. 11-39, 2012 WL 3109482 (M.D. La. July 31, 2012)(allowing defendants to challenge plaintiffs capacity to sue in a wrongful death and survival action when challenge to capacity first raised in pretrial order). None of the cases plaintiffs cite support waiver when the capacity defense is raised more than a few days before trial. *See, e.g., Lang v. Texas & P. Ry. Co.*, 624 F.2d 1275, 1277 (5th Cir.1980)(challenge to capacity is waived when raised for first time in a motion for new trial after a jury verdict and judgment are entered); *Garbincius v. Boston Edison Co.*, 621 F.2d 1171, 1174 (1st Cir. 1980)(defendants waived any defects as to plaintiff's standing by not making a specific negative averment prior to trial); *Ralston Oil and Gas Co. v. Gensco, Inc.*, 706 F.2d 685, 692 (5th Cir.1983)(defendants waived the capacity challenge because they did not include capacity as an issue in the pre-trial order); *MTO Maritime Transp. Overseas v. McLendon Forwarding Co.*, 837 F.2d 215, 218 (5th Cir.1988) (stating that trial court could legitimately have found waiver when party did not raise issue of capacity until eve of trial). Plaintiffs cite no case and the Court finds none in which a capacity defense was waived when it was raised in a motion for summary judgment before trial. Defendants' challenge to capacity, made before the pre-trial order deadline and before trial, has

not been waived.

**Filiation under Louisiana Tort Law**

Pursuant to 42 U.S.C. § 1988, the state wrongful death statute determines who has capacity to bring a wrongful death claim under § 1983. *Aguillard v. McGowen*, 207 F.3d 226, 231 (5th Cir. 2000). Louisiana Civil Code article 2315.1 provides for survival actions and article 2315.2 provides for wrongful death actions. Both statutes allow the "surviving spouse and child or children of the deceased, or either the spouse or the child or children" the right to bring suit to recover damages. Neither Tyralyn Harris nor Shannon Grace allege that they were Mr. Harris's spouse at the time of his death and plaintiffs do not argue that either woman is entitled to spousal standing. Accordingly, to the extent they bring lawsuits in their personal capacity, claims brought by Tyralyn Harris and Shannon Grace are dismissed.

Louisiana law defines "children" as "those persons born of the marriage, those adopted, and those whose filiation to the parent has been established in the manner provided by law, as well as descendants of them in the direct line." La. C.C. art. 3506(8) (2012). A man is presumed to be a child's father when the child is born during his marriage to the mother or "within three hundred days from the date of the termination of the marriage."

La. C.C. art. 185 (2012). If the child's filiation is not presumed, the child can initiate an action to establish paternity under Louisiana Civil Code article 197 to prove paternity in a lawful manner. The law states that "if the [paternity action] is instituted after the death of the alleged father, a[n] [illegitimate] child shall prove paternity by clear and convincing evidence." *Id.* If the illegitimate child was not formally acknowledged by the father, such as by being named on the child's birth certificate or performing a notarial act acknowledging paternity, the child must prove paternity by informal acknowledgment. *Id.; See* La. C.C. art. 197(c) (2012). The child must provide clear and convincing evidence that the deceased parent informally acknowledged the child when the parent was alive in order to bring a successful filiation claim. *Jenkins v. Mangano Corp.*, 774 So.2d 101, 103 (La.2000); *See* La. C.C. art. 197(d) (2012).

Evidence of filiation through informal acknowledgment "must be continuous, habitual, unequivocal, and leave little doubt that the alleged father considered himself to be the father of the child." *Jordan*, 568 So.2d at 1098. Informal acknowledgments of paternity take many forms, such as writings, "living in concubinage with the mother in his home at the time of the child's conception," having the same surname, consistently making representations to others that the child is his own, and naming

13

the child in his succession. *Jenkins*, 774 So.2d at 103. For example, in *Jenkins v. Mangano Corporation*, an illegitimate child successfully established filiation with her deceased father when she and her mother provided testimony amounting to clear and convincing evidence of filiation. *Id.* at 104–05. Her mother testified that she had exclusive sexual relations with the father when the child was conceived and that the father later acknowledged his paternity by addressing the child as his daughter within his community. *Id.* at 104. The daughter testified that she visited her father each summer, was publicly acknowledged as his daughter, and received her father's Social Security benefits. *Id.* Such evidence met the clear and convincing evidence threshold to prove that the father "continuously and unequivocally recognized" his illegitimate child to establish filiation. *Id.*

"A filiation action inherently accompanies an illegitimate child's wrongful death and survival action." *Henderson v. Turner*, CIV.A. 11-39, 2012 WL 3109482 (M.D. La. July 31, 2012). An illegitimate child plaintiff need not specifically plead a filiation action in a wrongful death and survival action claim; filiation is still an issue despite lack of a formal caption in the complaint. *Lollis v. Concordia Parish*, No. 1:05-cv-01474, 2010 WL 454721 (W.D.La. Feb. 9, 2010). A wrongful death and survival action claim brought by children born out of wedlock

14

gives "fair notice of the factual situation out of which ... filiation[ ] arises." *Id.* Therefore, illegitimate children acting as plaintiffs in wrongful death and survival action claims may amend and supplement complaints to establish paternity because filiation must be proved for successful litigation. *Id.*

Here, the adult and minor child plaintiffs argue that their pleadings establish that they are the children of Mr. Harris. The issue of capacity as to each of the child plaintiffs is addressed in the following paragraphs.

1. Brian and Brianka Jourdan

Plaintiffs state that Brian and Brianika Jourdan were born to Brian Harris and Anita Jourdan, in 1990 and 1991. Mr. Harris and Ms. Jourdan were not married and Brian and Brianika were not formally acknowledged by Mr. Harris, so plaintiffs must prove paternity by informal acknowledgment.[21] Plaintiffs submit Mr. Harris's obituary and funeral programs which list Brian and Brianika as his children.[22] Plaintiffs also submit affidavits from 1) Brian and Brianika, 2) their mother Anita Jourdan, 3) their maternal grandmother, 4) the mothers of Mr. Harris's other children, Shannon Grace and Tyralyn Harris, and 5) a family friend, which state that Brian Harris openly and continuously

---

[21] R. Doc. 55 at 19.

[22] R. Docs. 55-3, 55-4 at 4.

acknowledged Brian and Brianika as his own children.[23] Brian and Brianika testify in their affidavits that Mr. Harris paid court-ordered child support for Brian Jourdan and that Brianika Jourdan was awarded social security surviving benefits after Mr. Harris's death.[24] Brian and Brianika also have the same or similar first names as Brian Harris. The evidence meets the clear and convincing evidence threshold to prove that Mr. Harris "continuously and unequivocally recognized" Brian and Brianika so as to establish filiation. *See Jenkins*, 774 So.2d at 103-104.

2. Branin Harris

Branin Harris was legitimately born of the marriage of Mr. Harris and Shannon Grace in 1995 and Mr. Harris is listed on Branin's birth certificate as his father.[25] Filiation is thus established. *See* La. C.C. art. 185 (2012).

3. Jalen Aubert

Plaintiffs state that Jalen Aubert was born to Mr. Harris and Tyralyn Harris on June 24, 2001, before the couple was married. Mr. Harris is not listed on the birth certificate but plaintiffs submit a notarized acknowledgment of paternity signed

---

[23] R. Docs. 55-5, 55-6, 55-7, 55-8, 55-9, 55-10, 55-11.

[24] R. Docs. 55-5, 55-6, 55-7.

[25] R. Docs. 55-12, 55-13.

16

by Mr. Harris and Tyralyn Harris.[26] This notarial act is sufficient to establish formal acknowledgment of filiation. *See Jordan v. Taylor*, 568 So.2d 1097, 1098 (La.Ct.App.1990).

4. Jai Harris

Plaintiffs state that Jai Harris was born on May 28, 2008, of the union of Mr. Harris and Tyralyn Harris after they had married and divorced. Plaintiffs have established formal acknowledgment of filiation through Jai's birth certificate which lists Mr. Harris as his father.[27]

**B. *Excessive Force Claims***

As public officials, the NOPD officers are entitled to qualified immunity on plaintiffs' § 1983 excessive force claims unless "(1) [plaintiffs] have "adduced sufficient evidence to raise a genuine issue of material fact suggesting their conduct violated an actual constitutional right, and (2) the officers' actions were objectively unreasonable in light of clearly established law at the time of the conduct in question." *Newman v. Guedry*, 703 F.3d 757, 761 (5th Cir. 2012) (internal quotation omitted); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Even if the evidence supports a conclusion that

---

[26] R. Doc. 55-16.

[27] R. Doc. 55-14 at 8.

17

Plaintiffs' rights were violated, qualified immunity may still be invoked unless "the government official violated clearly established statutory or constitutional rights of which a reasonable person would have known." *Manis v. Lawson*, 585 F.3d 839, 845 (5th Cir. 2009). "Qualified immunity shields from civil liability all but the plainly incompetent or those who knowingly violate the law." *Id.* (internal quotations omitted). "Although qualified immunity is nominally an affirmative defense, the plaintiff bears a heightened burden to negate the defense once properly raised." *Newman*, 703 F.3d at 762.

Plaintiffs allege that the NOPD officers used excessive force in violation of their Fourth Amendment right against unreasonable seizure. *See Colston v. Barnhart*, 130 F.3d 96, 102 (5th Cir.1997). To prevail on an excessive force claim, plaintiffs must establish: '(1) injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable.'" *Freeman v. Gore*, 483 F.3d 404, 416 (5th Cir. 2007)(quoting *Tarver v. City of Edna*, 410 F.3d 745, 751 (5th Cir. 2005)). Claims of excessive force are fact intensive and they depend on "the facts and circumstances of each particular case." *Graham v. Connor*, 490 U.S. 386, 396-97 (1989). The Supreme Court has directed lower courts to consider three factors in this inquiry: (1) the severity of the crime at issue; (2) whether the suspect poses an

immediate threat to the safety of officers or others; and (3) whether the suspect is actively resisting arrest by flight. *Id.* at 396.

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). This is an objective standard: "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397; *see also Tennessee v. Garner*, 471 U.S. 1, 9 (1985) (court must determine whether "the totality of the circumstances justified" the particular use of force). This test "allow[s] for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." *Id.*

The NOPD officers contend that their use of deadly force was objectively reasonable. They assert that Brian Harris was noncompliant with their commands that he drop his knife, that they tried less severe use of force, that he got out of bed and was coming toward them with the knife in a menacing position, and that Officer McGee's use of his firearm was necessary to prevent serious injury or death to themselves. Plaintiffs argue that

taken as a whole, the officers actions were unreasonable. They point to the officers' awareness that Mr. Harris had not threatened his wife or children, was depressed, and had possibly taken sleeping pills. They also argue that to the extent Mr. Harris became agitated and threatening, it was due to provocation by the NOPD officers who roused him from his bed by bursting into his bedroom yelling, and seconds later firing taser darts at him. Although the Court finds NOPD's whole approach to this type of situation troubling, in light of controlling law, the Court concludes that the use of the firearm was objectively reasonable under the circumstances.

The defendants concede that Brian Harris was not being placed under arrest for any suspected crime. Therefore, the only applicable *Graham* consideration is whether he posed an immediate threat to the safety of the officers or others. *Graham,* 490 at 396. All of the Graham factors need not "be present for an officer's actions to be reasonable; indeed, in the typical case, it is sufficient that the officer reasonably believed that the suspect posed a threat to the safety of the officer or others." *Rockwell*, 664 F.3d at 992 (5th Cir. 2011) cert. denied, 132 S. Ct. 2433, 182 L. Ed. 2d 1062.

In the Fifth Circuit, the Court's inquiry of an officer's use of deadly force must focus on the situation *at the moment that he fired his weapon. See e.g. Rockwell v. Brown*, 664 F.3d

20

985, 991 (5th Cir. 2011) <u>cert. denied,</u> 132 S. Ct. 2433 (U.S.

2012). In *Rockwell*, for example, a mother called the police for

help dealing with her mentally ill son who had threatened her and

was demonstrating suicidal behavior. *Id.* at 988. After talking to

the son through the locked door of his room, the police officers

decided to arrest him and breached the door. *Id.* at 989. The son

then charged at the officers with two eight-inch knives, pushing

one officer and slashing another before the officers shot and

killed him. The plaintiffs in that case relied on case law from

other circuits to argue that the grant of qualified immunity to

the officers was improper because the court failed to consider

the impropriety of the officers forcing entry into the bedroom in

evaluating the reasonableness of the officer's use of deadly

force. *Id.* at 992. The Fifth Circuit unequivocally rejected this

argument.

> It is well-established that the excessive force inquiry
> is confined to whether the officer or another person
> was in danger at the moment of the threat that resulted
> in the officer's use of deadly force. At the time of
> the shooting, Scott was engaged in an armed struggle
> with the officers, and therefore each of the officers
> had a reasonable belief that Scott posed an imminent
> risk of serious harm to the officers. We need not look
> at any other moment in time.
>
> Accordingly, the officers' use of deadly force was
> objectively reasonable.

*Id.* at 992-993 (quotations omitted); *See also Fraire v. City of

Arlington,* 957 F.2d 1268, 1276 (5th Cir. 1992) ("[R]egardless of

what had transpired up until the shooting itself, [the suspect's]

movements gave the officer reason to believe, at that moment, that there was a threat of physical harm."); *Young v. City of Killeen*, 775 F.2d 1349, 1353 (5th Cir.1985) (finding that an officer's use of deadly force was reasonable even where the arrest was "negligently executed"); *Ramirez v. Knoulton*, 542 F.3d 124, 129 (2008) ("the magistrate judge improperly criticized [Officer] Knoulton's failure to consider the use of non-lethal force or to employ a crisis negotiator").

When looking at "the moment of the threat that resulted in the officer's use of deadly force," Officer McGee's shooting of Brian Harris was objectively reasonable. *Rockwell,* 664 F.3d at 993. It is clear from the taser videos that at the moment shots were fired, Mr. Harris had stood up out of bed, was raising the knife above his head, and was moving toward the officers. It is also undisputed that the bedroom was small and cramped. Mr. Harris appeared agitated and defiant.[28] The officers had twice discharged tasers at Mr. Harris, and he nonetheless continued to refuse to comply with their commands to drop his knife. In their depositions, Officers Kish and Parker testify that immediately before the shooting, Harris was coming at them and was within striking distance of Officer Kish.[29] Officer Kish, who was

---

[28]   Defendant's Exhibit 12 ("I'm not dropping nothing.").

[29]   R. Doc. 104-2 at 13 ("At that point, he was close, yes."); R. Doc. 104-3 at 11 ("He began to step towards Officer Kish with the knife and attempted to stab officer Kish").

holding the taser and had not drawn his gun, testified that he remembers "looking up at him and seeing him coming at me thinking this is gonna hurt."[30] Even drawing all reasonable inferences in favor of the plaintiffs, in the moment he was shot, Brian Harris was moving toward the officers in a small space after being unsuccessfully shot at twice with tasers, and was brandishing a knife that the officers had repeatedly commanded him to drop. Under these circumstances, the Court accepts that the officers reasonably feared for their safety at the moment when Officer McGee shot Brian Harris. *See Elizondo v. Green*, 671 F.3d 506, 510 (5th Cir. 2012) cert. denied, 133 S. Ct. 409, 184 L. Ed. 2d 31 (U.S. 2012) (deadly force against a suicidal and intoxicated teen was not clearly unreasonable where teen ignored repeated instructions to put down the knife he was holding, and was hostile, in close proximity to the officer, and moving closer).

Like the plaintiffs in *Rockwell*, the plaintiffs in this case urge the Court to zoom out from the moment of Mr. Harris's shooting and to focus on the actions of the NOPD before that moment. Plaintiffs argue that an officer's defensive use of deadly force should not be sanctioned when the officers "recklessly provoked a violent confrontation that led to the shooting." They rely on several Ninth Circuit cases in which the court held that "where an officer intentionally or recklessly

---

[30] R. Doc. 104-2 at 13.

provokes a violent confrontation, if the provocation is an independent Fourth Amendment violation, he may be liable for his otherwise defensive use of deadly force." *Billington v. Smith*, 292 F.3d 1177 (9ᵗʰ Cir. 2002); *see also Espinosa v. City & County of San Francisco*, 598 F.3d 528, 538 (9th Cir. 2010) ("[E]ven though the officers reasonably fired back in self-defense, they could still be held liable for using excessive force because their reckless and unconstitutional provocation created the need to use force."). The Ninth Circuit held in *Espinosa* and *Alexander v. City and County of San Francisco,* 29 F.3d 1355, 1366 (9th Cir. 1994)*,* that when police officers' entry into a dwelling amounts to an independent constitutional violation, which leads to a situation where officers are required to use deadly force, the use of deadly force is rendered unreasonable by the initial illegal entry. *See Espinosa*, 598 F.3d at 538-39 ("If an officer intentionally or recklessly violates a suspect's constitutional rights, then the violation may be a provocation creating a situation in which force was necessary and such force would have been legal but for the initial violation.") (citing *Billington*, 292 F.3d at 1189). Because the Fifth Circuit has rejected this approach, the Court cannot apply it here. *See Rockwell*, 664 F.3d at 992-93 (refusing to follow the Ninth Circuit and holding that "the excessive force inquiry is confined to ... the moment of the threat that resulted in the officer's use of deadly force.")

24

Plaintiffs also argue that the first tasering was excessive force amounting to a separate constitutional violation. They argue that the officers' decision to use the taser on Mr. Harris when he did not appear to be a threat to others, without first attempting to use non-violent methods, was clearly unreasonable. But regardless of whether it was unreasonable, any excessive force claim based on the first taser discharge must fail because the plaintiffs have not established a resulting injury. *See Newman v. Guedry*, 483 F.3d at 416. In fact, plaintiffs aver that the taser was not effective in administering a shock to Mr. Harris. The record contains no evidence that the first taser caused pain or other injury to Harris in the moments before he was shot. Moreover, in similar circumstances, the Fifth Circuit has rejected arguments that unreasonable police actions leading up to a victim's confrontation with police were the necessary cause of the death of the victim. *See e.g. Rockwell*, 664 F.3d at 992. In disposing of such an argument in *Rockwell*, the Fifth Circuit said:

> [T]he Rockwells urge this Court to view the officers' breach of the locked door to Scott's room as the actual moment of the use of deadly force because it "carried a substantial risk of causing serious bodily harm" and was the immediate but-for cause of the resulting altercation between Scott and the officers. ... [T]he Rockwells' argument that the breach of the door necessarily caused the shooting that followed is nothing more than speculation. Thus, the magistrate judge correctly found that the "breach of the door was neither the moment where deadly force was employed nor did Scott's death result directly and only from the

breach of the door."

*Id.* Like the breach of the door in *Rockwell*, the unsuccessful use of the first taser here was not the direct cause of Brian Harris's death.

Accordingly, because of the threat of serious injury or death to the officers at the moment Officer McGee shot Brian Harris, the Court finds the use of deadly force objectively reasonable. Because the Court holds that Mr. Harris's Fourth Amendment right to be free from the use of deadly force was not violated, there is no need to consider whether that right was clearly established. *Rockwell*, 664 F.3d at 993. The Court therefore grants defendants' motion for summary judgment.

While the bounds of the law dictate this holding, the Court notes its serious concern with the officers' actions in this incident. The NOPD's approach to handling a call for medical help was outsized and inappropriate. Tyralyn Harris called 911 for help with a depressed loved one, and NOPD treated the operation as if it were a crime scene. Instead of tasing Mr. Harris within seconds of entering his bedroom, the officers could have kept a safe distance from him, avoided provocative displays of force, made it clear that they were there to help him, and taken as much time as necessary to talk him into putting down his knife, including waiting for mental health professionals to arrive. *See Buchanan v. City of Milwaukee*, 290 F. Supp. 2d 954, 961 (E.D.

Wis. 2003) (describing best practices for police officers in encounters with emotionally disturbed persons).

Judge DeMoss of the Fifth Circuit Court of Appeals has repeatedly urged a change in law enforcement procedures to prevent the deaths of emotionally disturbed people in circumstances similar to those seen here. *See Rockwell,* 664 F.3d at 996-97 (DeMoss, J., concurring); *Elizondo*, 671 F.3d at 511 (DeMoss, J., concurring). In his concurrence in *Rockwell*, Judge DeMoss, while finding the majority to be correct in its legal judgments, noted that "the state of the law in these particular circumstances remains relatively primitive," and wrote separately to express his disappointment with the actions of the officers in that case. *Id.* He described that case as follows:

> It is undisputed that Scott was in no position to harm any other person while locked in his bedroom. Yet the officers escalated the situation before even 30 minutes had passed by breaching his bedroom door without a warrant and with firearms drawn. As I see it, they provoked a man they knew to be mentally ill into a violent reaction. They did not allow for any time to defuse the situation or implement the safest procedures possible to take him into custody. Preventing a possible suicide is a worthy goal, but an armed entry that heightens the risk to the potential victim's life certainly is not the best way to accomplish that goal.

*Id*. at 996-97 (concurrence); *see also Elizondo*, 671 F.3d at 511 (DeMoss, J., concurring) (agreeing that the officer's use of deadly force against noncompliant suicidal teen did not amount to a Fourth Amendment violation, but noting that "[f]orcing Ruddy's

27

bedroom door open, yelling orders at him, and immediately drawing a firearm and threatening to shoot was a very poor way to confront the drunk, distraught teenager who was contemplating suicide with a knife."). The Court agrees with Judge DeMoss's conclusion in *Elizondo*, *supra*: "Either law enforcement procedures or our law must evolve if we are to ensure that more avoidable deaths do not occur at the hands of those called to 'protect and serve.'" *Id.*

### D. *Monell Claims*

In the absence of a constitutional violation, there can be no municipal *Monell* liability for the City of New Orleans. *James v. Harris County*, 577 F.3d 612, 617 (5th Cir. 2009). Thus the Court grants summary judgment for the City of New Orleans.

### C. *State Law Claims*

Having determined that plaintiffs' federal claims must be dismissed, the Court declines to exercise supplemental jurisdiction over their remaining state law claims. *See* 28 U.S.C. § 1367(c)(3) ("The district court may decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed all claims over which it has original jurisdiction."). "When a court dismisses all federal claims before trial, the general rule is to dismiss any [supplemental]

28

claims." *Bass v. Parkwood Hosp.,* 180 F.3d 234, 246 (5th Cir.1999) (emphasis in original). Further, "the Supreme Court has counseled that the dismissal of all federal claims weighs heavily in favor of declining jurisdiction." *McClelland v. Gronwaldt,* 155 F.3d 507, 519 (5th Cir.1998), *overruled on other grounds by Arana v. Ochsner Health Plan,* 338 F.3d 433 (5th Cir.2003)).

**E. *Unsealing of Sealed Evidence***

In accordance with its previous orders,[31] the Court, having relied upon the video evidence in deciding this motion for summary judgment, orders the three video recordings, Exhibits 11, 12, and 15, unsealed.

**IV. Conclusion**

For the forgoing reasons, the Court GRANTS defendants motion for summary judgment on all claims.

New Orleans, Louisiana, this ___29th___ day of March, 2013.

*Sarah Vance*
_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE

---

[31] R. Doc. 64; R. Doc. 107.